# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

**United States of America,**

      **Plaintiff,**

**v.**                                                                                       **Case No. 04-20127-01-JWL**

**Jose Francisco Serrano Leon,**

      **Defendant.**

## MEMORANDUM & ORDER

On February 1, 2005, the defendant entered a plea of guilty to aiding and abetting the interstate communication of a threat in violation of 18 U.S.C. § 875(c) and 18 U.S.C. § 2. This case is presently before the court on defendant's motion to withdraw his guilty plea (doc. 77). As explained below, the court denies the motion.

**I.     Factual and Procedural Background**

On June 16, 2004, the U.S. Attorney's Office in Kansas City, Kansas received correspondence via fax from a Kinko's copy center in Independence, Missouri. The correspondence, an anonymous letter, was addressed to "Mrs. Prosecutor." In brief, the detailed letter contained a threat to injure Deputy Sheriff Jess Valdez II of the Johnson County, Kansas Sheriff's Department and Detective Jose Carrillo of the Overland Park, Kansas Police Department and an unnamed member of Detective Carrillo's family. Specifically, the letter explained that the author had knowledge that "Benjamin Hernandez had paid 4 guys $20,000 dollars in cash to kill

a family member of Mr. Carrillo;" that Mr. Hernandez was "going to kill . . . Carillo because he's Mexican and a traitor to his race;" and that Mr. Hernandez was going to kill "another white male officer that has a baby" whom the author later identified as "Valdez." The letter also stated "you will regret if you don't pay attention to what I'm telling you" and that "if they kill any person you will be held reliable [sic] not me."

An investigation ensued which yielded no evidence linking Mr. Hernandez to the threat made to the two officers. When confronted with the letter, Mr. Hernandez immediately identified the defendant as the author of the letter. A surveillance video from the Kinko's location from which the anonymous letter was faxed showed a woman in the store at the time the letter was faxed. This person was identified as Sonya Trujillo, the secretary for the defendant. Ms. Trujillo later admitted that she had faxed the letter at the direction of the defendant, who had earlier dictated the letter to her to type. The defendant initially denied any knowledge of the letter, then admitted writing the letter but doing so at the direction of a woman named "Angel." During a subsequent interview with agents, the defendant admitted that he did not write the letter at the direction of "Angel," that much of the information contained in the letter was untrue but stated that someone else had directed him to write the letter.

On September 16, 2004, the defendant was charged in a one-count indictment with a violation of 18 U.S.C. § 875(c), interstate communication of a threat. The defendant retained counsel in October 2004 and his court-appointed counsel was permitted to withdraw at that time. In November 2004, the defendant filed several motions, including a motion to dismiss the indictment; all motions were denied in December 2004. On December 9, 2004, a superseding

2

indictment was returned, adding an "aiding and abetting" allegation to the original charge. Trial was set for January 4, 2005. In late December 2004, the defendant filed a motion to continue the trial setting and his counsel filed a motion to withdraw. Both motions were granted, the trial was rescheduled for February 8, 2005 and new counsel was appointed for the defendant.

On February 1, 2005, the defendant entered a plea of guilty to the charge contained in the superseding indictment and the court accepted the plea. The defendant now asserts that he has no memory of the plea hearing and that he agreed to plead guilty only because he was despondent after "Officer Smith"–a corrections officer in the infirmary at Corrections Corporation of America ("CCA") where the defendant was being held–allegedly advised him in January 2004 that he had AIDS. The defendant testified that upon learning he had AIDS, he was too ashamed to tell his family and simply wanted to "finish himself off." In any event, sentencing was scheduled for April 18, 2005 and was later continued to May 2, 2005. On May 2, 2005, at the time of the sentencing hearing, the court was notified that the defendant was unavailable and that he had been hospitalized that day for what appeared to be a suicide gesture. Sentencing was continued to May 10, 2005 and the defendant was sent to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri. According to the defendant, he learned shortly after his arrival in Springfield that he in fact did not have AIDS and was not HIV-positive.

On May 5, 2005, the government filed a motion for a psychiatric examination and the court granted the motion and vacated the sentencing hearing. The defendant's mental state was evaluated over the course of the next six months by James K. Wolfson, M.D., a staff psychiatrist at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri. Dr. Wolfson also referred the

3

defendant for a neuropsychology consult which included additional testing by Robert L. Denney, Psy.D., a neuropsychologist at the U.S. Medical Center.

On September 27, 2005, the defendant filed a pro se motion to replace counsel in which he suggested that his counsel coerced him into entering a plea of guilty. In December 2005, the court granted the defendant's motion and new counsel was again appointed for the defendant. On January 30, 2006, the defendant filed a motion to withdraw his plea of guilty. On March 13, 2006, the court held an evidentiary hearing on the motion and is now prepared to rule on the motion.

## II.     Standard

A defendant does not have an absolute right to withdraw a guilty plea. *United States v. Siedlik*, 231 F.3d 744, 748 (10th Cir. 2000). Under Federal Rule of Criminal Procedure 11(d)(2)(B), if a motion to withdraw a plea of guilty is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows "a fair and just reason for requesting the withdrawal." The burden is on the defendant to establish a "fair and just reason" for the withdrawal. *Siedlik*, 231 F.3d at 748. In analyzing whether a defendant has met this burden, the court considers the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

*United States v. Yazzie*, 407 F.3d 1139, 1142 (10th Cir. 2005) (quoting *United States v.*

*Sandoval*, 390 F.3d 1294, 1298 (10th Cir. 2004)).

**III.    Analysis**

The defendant contends that he should be permitted to withdraw his guilty plea for two reasons–because his plea was not knowing and voluntary in light of the fact that at the time he entered his guilty plea he believed that he was HIV-positive or had AIDS and because he maintains and has always maintained his innocence.  Regardless of whether other factors weighed in favor of or against permitting withdrawal of the defendant's guilty plea, the court concludes that it would permit the defendant to withdraw his plea if the defendant honestly (but mistakenly) believed that he was HIV-positive or had AIDS at the time he entered his plea and therefore did so purely in a desperately despondent state of mind which virtually deprived him of his ability to enter a plea knowingly and voluntarily.  The court, then, begins its analysis of the defendant's motion by addressing the issue of his alleged belief concerning HIV and AIDS.

*A.    Knowing and Voluntary Plea*

At the evidentiary hearing, the defendant testified that an "Officer Smith,"[1] who according to the defendant was the corrections officer in charge of the infirmary at CCA, was "very tough"

---

[1] No evidence was presented at the hearing by the defendant to corroborate the existence of this alleged officer nor by the government to refute it.

5

on him from the moment he arrived at CCA and that she frequently "made fun" of him, calling him a homosexual and referring to him as "Mrs." The defendant testified that Officer Smith, in early to mid-January 2005, told him that he had AIDS. No one else was present during this conversation. The defendant testified that he simply wanted to "finish himself off" upon learning this information and he further testified that he did not confirm the information with a doctor or nurse nor did he advise anyone in his family because he was too ashamed to discuss it. According to the defendant, he agreed to enter a guilty plea several weeks later because he was despondent about the fact that he had AIDS and he has no memory of entering a guilty plea. When asked on cross-examination whether he had engaged in any activity that might make him susceptible to contracting HIV, the defendant responded that he had never shared intravenous needles and had never engaged in any homosexual activity but that he had been bitten by his roommate at CCA who was a pedophile and he believed he had contracted the virus through his roommate. The defendant testified that he believed he had AIDS until he was transferred to the medical facility in Springfield, Missouri in May 2005 and his health care providers there advised him that he did not have AIDS and did not have the HIV virus.

The court concludes that the defendant's testimony on this subject is simply not credible and, thus, rejects the contention that the defendant's plea was not knowing and voluntary. That is, the court does not believe that the defendant ever honestly believed that he had AIDS or that he was HIV positive. It is uncontroverted that the defendant's medical records from CCA contain no reference to AIDS or HIV. To be sure, if a health care provider at CCA believed that the defendant had AIDS or HIV, some documentation of that illness would appear in the defendant's medical

records. It is also uncontroverted that the defendant never received or requested any medications for AIDS or HIV–and the evidence established that the defendant frequently requested medication and assistance for other ailments. These facts, then, indicate to the court that the defendant was never told by anyone at CCA (or that he was not told by anyone in any credible fashion) that he had AIDS or HIV. In addition, it defies logic to believe that the defendant was too ashamed to seek confirmation from a doctor or nurse (Officer Smith was neither a doctor nor a nurse) and too ashamed to confide in his family when he admitted that the only possible way in which he could have contracted the virus was a bite he received from his cellmate. In other words, there was nothing even arguably "shameful" about the manner in which he allegedly contracted the virus. The court infers from the defendant's failure to seek confirmation from a doctor or nurse and his failure to confide in his family that he did not actually believe that he suffered from AIDS or that he was HIV-positive.

In rejecting the defendant's claims about his mental status at the time he entered his plea, the court is also persuaded by the detailed forensic report submitted by James K. Wolfson, M.D., a staff psychiatrist at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri and the neuropsychology consultation report submitted by Robert L. Denney, Psy.D., a neuropsychologist at the U.S. Medical Center. In his report, Dr. Wolfson repeatedly references the defendant's attempts to appear so mentally impaired that he could not recall even the most basic information. For example, Dr. Wolfson noted that on one occasion, the defendant "affected a childish demeanor" and acted "confused and disoriented . . . beyond what is ordinarily experienced with persons with legitimate severe memory difficulties from head injuries, to the

7

point of claiming to be uncertain whether or not he even had siblings." Dr. Wolfson described the defendant as a "remarkably vague historian" who "appeared completely useless at providing any biographical information." Dr. Wolfson's initial impression of the defendant "was of near-certain malingering, with the possibility of coincident depression of psychosis difficult to exclude with certainty, since any legitimate distress, if present, would be obscured by the defendant's bogus presentation."

After subsequent interviews with the defendant, Dr. Wolfson stated that the defendant "reported relatively little in the way of believable symptomatology." An interpretation of the defendant's responses to psychological testing revealed that the responses were "irrelevant" and "highly inconsistent." It was determined that the defendant did not complete the test as instructed and that his pattern of responding was "consistent with an individual who did not pay attention to the contents of the items." It was further determined that the defendant "put forth little or no effort in testing" and that the test data was ultimately invalid because of these issues.

With respect to the defendant's assertion that he had no memory of entering a guilty plea, Dr. Wolfson concluded that the claim was simply not credible. According to Dr. Wolfson,

> [r]egarding the defendant's claimed memory deficit, it is my opinion, with reasonable medical certainty, that he is malingering, a conclusion that is supported by psychological test findings and by the incompatibility of the defendant's description of his purported memory deficits with the fashion in which legitimate impairment manifests itself.

He concluded that the defendant was competent at the time he entered in his plea in February 2005 and that the defendant was clearly competent to proceed with this case, as Dr. Wolfson was "skeptical of the notion that [the defendant] was ever truly suffering from actual depression, given

8

the degree of apparent, continuing con-artistry he has displayed with me."

Because the defendant's claimed memory deficit "was discordant with [Dr. Wolfson's] observations of the defendant . . . and in light of findings suggestive of malingering on our usual psychological testing," Dr. Wolfson referred the defendant to Dr. Denney. Dr. Denney, in turn, concluded that the defendant was "malingering his claimed memory deficit." Dr. Denney noted that the defendant's neuropsychological test results were "consistent with . . . patients asked to fake impairment" and that his scores were far below "the average score of moderately severe brain injured individuals." According to Dr. Denney, the defendant's "overall profile . . was actually worse than volunteer simulators and individuals with advanced dementia" and the defendant's test results "suggested intentional suppression of neurocognitive performance as it related to memory functioning." Ultimately, Dr. Denney concluded that the defendant was "attempting to appear disingenuously cognitively impaired." As explained by Dr. Denney:

> The overall pattern of scores is most consistent with simulated malingerers. This information leaves little doubt that Mr. Serrano Leon is attempting to grossly exaggerate memory and neurocognitive impairments. . . . The inconsistency between his severely impaired test scores and his overall level of functioning and articulate manner were striking. . . . As a result of these inconsistencies and current test results, it is my opinion that Mr. Serrano Leon is malingering neurocognitive deficits.

Like Dr. Wolfson, Dr. Denney concluded that the defendant was competent to proceed with this case.

In rejecting the defendant's argument that his plea was not knowing and voluntary, the court also looks to the language of the plea agreement itself and the court's Rule 11 plea colloquy with the defendant. *See United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004). Paragraph 15

9

of the defendant's plea agreement expressly states that the plea was knowing and voluntary:

> The defendant has had sufficient time to discuss this case, the evidence, and this agreement with the defendant's attorney and defendant is fully satisfied with the advice and representation provided by defendant's counsel. Further, the defendant acknowledges that he has read the plea agreement, understands it and agrees it is true and accurate and not the result of any threats, duress or coercion. The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this agreement embodies each and every term of the agreement between the parties. The defendant acknowledges that the defendant is entering into this agreement and is pleading guilty because the defendant is guilty and is doing so freely and voluntarily.

The plea agreement, then, demonstrates that the plea was knowingly and voluntarily entered. *See United States v. Bridges*, 2003 WL 21462974, at *4 (10th Cir. June 19, 2003) (holding that plea was knowing and voluntary in part because defendant signed plea agreement which contained a section stating that he was entering the plea "freely and voluntarily" and with full understanding of the matters in the petition). In addition, the defendant signed a plea petition that expressly stated that he was entering his guilty plea "freely and voluntarily."

More significantly, during the court's Rule 11 colloquy with the defendant, the defendant specifically verified that he understood the charge brought against him, that he was satisfied with his counsel's representation, that he understood the terms of the plea agreement, that he was entering his plea freely and voluntarily and because he was, in fact, guilty of the charge, that he had committed the acts set forth in the factual basis contained in the plea agreement and that it was his decision to enter the plea of guilty. The court has no reason to doubt the defendant's responses to the court's questions on these subjects, particularly as the defendant requested and received clarification during the colloquy on other subjects that he stated he did not understand. *See United*

*States v. Cockerham*, 237 F.3d 1179, 1188-89 (10th Cir. 2001) (upholding voluntariness of plea after colloquy with defendant as to defendant's understanding of the terms of the plea and his voluntary entry into the agreement). In short, the court's review of the plea agreement and the plea colloquy reveals nothing to suggest that the defendant's guilty plea was either unknowing or involuntary.

*B.     Actual Innocence*

The defendant also urges that he should be permitted to withdraw his guilty plea because he is innocent of the crime charged in the indictment. Specifically, the defendant asserts that his communication was not intended as a threat but as a warning intended to assist law enforcement. To be clear, then, the defendant does not assert that he did not author the communication or that he did not direct the sending of the communication. Indeed, at the defendant's plea hearing, the defendant expressly admitted that he dictated the contents of the letter and caused the letter to be transmitted to the United States Attorney's Office in Kansas City, Kansas. According to the defendant, then, he was simply passing on the existence of a third party's threat for informational purposes.

In a related context, the Tenth Circuit has examined the circumstances under which a defendant who "repeats a third party's threat may be subjected to criminal liability." *See United States v. Viefhaus*, 168 F.3d 392, 396 (10th Cir. 1999) (examining 18 U.S.C. § 844(e)). The Circuit uses an objective test focusing on how a reasonable person would foresee the statement being "interpreted by persons hearing or reading it." *Id.* As the Circuit explained:

> If a defendant's repetition of a third party's threat is reasonably interpreted as a simple disclosure of the existence of the threat for informational purposes, no illegality has occurred. If, on the other hand, . . . the defendant has effectively adopted the third party's threat as his own. . . . . [t]here is no requirement that the defendant convey an intent to carry out the threatened conduct himself."

*Id.* Under *Viefhaus*, then, a defendant who, like Mr. Serrano Leon, admittedly sent a communication containing a threat would not be able to assert his or her innocence unless he or she could show that the third party had, in fact, made a threat. In other words, the defendant cannot be said to have "repeated" a third party's threat or to have disclosed "the existence of the threat for informational purposes" if no threat actually exists.

In this case, it appears that no true third-party threat ever existed and that the information the defendant purported to disclose was false and was known by the defendant to be false. The PSIR indicates that the defendant eventually admitted that Benjamin Hernandez, contrary to what the defendant had conveyed, had not paid anyone any money to kill the two officers. The PSIR further suggests that the defendant purposefully conveyed false information to incriminate Mr. Hernandez. At no time has the defendant contended that the threat was real or that he believed the threat to be real. Because the defendant has not set forth facts supporting a legally cognizable defense, he has not effectively denied his culpability. *See United States v. Barker*, 514 F.2d 208, 220-21 (D.C. Cir. 1975) ("If the movant's factual contentions, when accepted as true, make out no legally cognizable defense to the charges, he has not effectively denied his culpability, and his withdrawal motion need not be granted."), *cited with approval in United States v. Burk*, 1994 WL 526706, at *2 (10th Cir. Sept. 26, 1994). The court, then, rejects the defendant's assertion of innocence.

For the foregoing reasons, the court denies the defendant's motion to withdraw his guilty plea. A sentencing hearing will be reset by separate order.

**IT IS SO ORDERED**.

Dated this 4th day of April, 2006, at Kansas City, Kansas.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge